State of NEW YORK and Erin M. Crotty, Commissioner of Environmental Conservation of the State of New York, Plaintiffs,

v.

MIRANT NEW YORK, INC. and Mirant Lovett, L.L.C., Defendants.

No. 03 CV 4236(JGK).

United States District Court, S.D. New York.

Oct. 15, 2003.

J. Jared Snyder, Dennis C. Vacco, Attorney General of New York, Albany, NY, for plaintiffs.

### *OPINION and ORDER*

KOELTL, District Judge.

The State of New York and Erin M. Crotty, the Commissioner of Environmental Conservation of the State of New York, ("state") seek to have this Court enter a Consent Decree that resolves the claims brought by the State against Mirant New York, Inc. and Mirant Lovett, L.L.C. ("Mirant") and requires Mirant to bring the Lovett power generating station ("Lovett Plant"), located in Stony Point, New York, into compliance with federal and state environmental laws. The claims relate specifically to the Lovett Plant's emissions of nitrogen oxides and sulfur dioxide. The claims were brought under the Clean Air Act, 42 U.S.C. § 7400 *et seq.* (the "Act"), the New York State Environmental Conservation Law §§ 71–2103 & 71–2107, and the New York State Executive Law § 63(12). The State seeks injunctive relief against Mirant for violations of the Act's New Source Review provisions, including the Prevention of Significant Deterioration ("PSD") provisions of 42 U.S.C. §§ 7470–92 and 40 C.F.R. § 52.21, which are also incorporated into New York law, 6 N.Y.C.R.R. § 200.10. The State also

brought a claim under the common law of public nuisance.

## I.

On June 11, 2003, the State initiated this action by filing a complaint seeking injunctive relief against violations of federal and state environmental laws involving the defendants' construction and operation of the Lovett Plant. The complaint alleges that Orange & Rockland Utilities, Inc., the prior owners of the Lovett Plant, modified Units 4 and 5 of the Lovett Plant without first obtaining a permit from the New York State Department of Environmental Conservation ("DEC"), as required by the PSD provisions of the Clean Air Act and without installing Best Available Control Technology ("BACT"). (Compl. ¶ 3.) The complaint further alleges that Mirant purchased the Lovett Plant in 1999 and that Units 4 and 5 have been operated since that time in continuing violation of these provisions. (*Id.*) The State claims that as a result of these violations, the Lovett Plant has emitted nitrogen oxides and sulfur dioxide in levels that violate both state and federal environmental laws, as well as the common law of public nuisance. (*Id.* ¶¶ 1–2.)

Also on June 11, 2003, the parties entered into a Consent Decree that settled the claims alleged in the complaint. Without admitting the allegations of the complaint, Mirant agreed in the Consent Decree to reduce emissions from Units 4 and 5 by, at Mirant's election: (1) implementing controls for emissions of nitrogen oxides and sulfur dioxide from both Units; (2) shutting down the Units; or (3) in the case of Unit 5, converting it from coal to natural gas power. (Consent Decree ¶¶ 27–33.) Whichever option Mirant elects, Unit 5 must be brought into compliance with the terms of the Consent Decree by 2007, and Unit 4 must be brought into compliance by 2008. (*Id.*) The State has agreed not to seek any civil penalties authorized under the Clean Air Act. (*Id.* ¶¶ 45–46.) Mirant contends that compliance with the terms of the Consent Decree will require it to spend over $100 million. (Declaration of Algird F. White, Jr., dated Sept. 4, 2003 ("White Decl."), ¶ 7.)

Pursuant to 42 U.S.C. § 7604(c)(3), the State provided a copy of the Consent Decree to the United States Attorney General and the Administrator of the United States Environmental Protection Agency ("EPA") to allow each of them to provide any comments respecting the Consent Decree to the Court or intervene in this action as a matter of right. (Declaration of J. Jared Snyder dated Aug. 4, 2003, ¶ 3.) Neither the EPA nor the Attorney General has provided any adverse comments concerning the Consent Decree to either the parties or the Court, and neither has moved to intervene. (*Id.* ¶ 4.) The EPA has advised Mirant and the State by letter that it supports the entry of the Consent Decree. (*Id.* and Ex. D.) Although not required by law, the State also took public comment on the Consent Decree after publishing notice of the settlement in the Environmental Notice Bulletin of the State of New York on June 18, 2003. No comments were received. (*Id.* ¶ 5.)

On July 14, 2003, Mirant filed voluntary petitions in the United States Bankruptcy Court for the Northern District of Texas, Forth Worth Division, for relief under Chapter 11 of the United States Bankruptcy Code. Mirant continues to manage and operate its businesses, including the Lovett Plant, as debtors-in-possession pursuant to 11 U.S.C. §§ 1107, 1108. (White Decl. ¶ 2.)

Mirant has filed a motion with the bankruptcy court for approval of the Consent Decree. (Supplemental Declaration of J. Jared Snyder dated Sept. 23, 2003 ("Supp.

Snyder Decl."), ¶ 4.) In that motion, Mirant argues that the Consent Decree is "fair and equitable to the creditors and properly balances [Mirant's] business needs with the need for responsible environmental protection." (Debtor's Mot. Approving Consent Decree attached as Ex. A to Supp. Snyder Decl. at 20.) The State argues that this Court should approve the Consent Decree and not wait for approval of the bankruptcy court because there is plainly jurisdiction to enter the Consent Decree, no opposition to the terms of the Consent Decree has been raised, and the additional consideration that may be of concern to the bankruptcy court should not interfere with the enforcement of the environmental laws accomplished by the Consent Decree.

## II.

■ To enter the Consent Decree in this case, the Court must conclude that the decree (1) springs from and serves to resolve a dispute within the court's subject matter jurisdiction; (2) comes within the general scope of the case made by the pleadings; and (3) furthers the objectives of the law upon which the complaint was based. *Kozlowski v. Coughlin,* 871 F.2d 241, 244 (2d Cir.1989); *Cronin v. Browner,* 898 F.Supp. 1052, 1064 (S.D.N.Y.1995).

## A.

■ The primary question raised by this motion, and the only real point of

dispute between the parties, is this Court's jurisdiction to enter the Consent Decree, given Mirant's ongoing bankruptcy proceeding in Texas. The Court would have subject matter jurisdiction over the action and the enforcement of any consent decree pursuant to the citizen suit provisions of the Clean Air Act, 42 U.S.C. § 7604, as well as under 28 U.S.C. §§ 1331 and 1367. However, the initial issue raised here is whether the motion to enter the Consent Decree is subject to the automatic stay imposed by the Bankruptcy Code. Whether the stay applies to this case is an issue of law within the competence of both this Court, as the court before which the case is pending, and the bankruptcy court supervising Mirant's reorganization. *See In re Baldwin–United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985);[1] *Patterson v. Newspaper and Mail Deliverers' Union of N.Y. and Vicinity,* 138 B.R. 149, 151 (S.D.N.Y.1992).

■ "Section 362(a) of Title 11 of the United States Code stays the commencement or continuation of virtually all proceedings against a debtor, including enforcement of judgments, that were or could have been commenced before the debtor filed for bankruptcy." *S.E.C. v. Brennan,* 230 F.3d 65, 70 (2d Cir.2000). Section 362(a) provides in pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under

1. In *Baldwin,* the Court of Appeals for the Second Circuit held that, on the facts of the case before it, the district court's exercise of its authority to determine the applicability of the automatic stay was an abuse of discretion. The court concluded that the equities of the case favored allowing the bankruptcy court to determine the applicability of the automatic stay in the first instance, because that course would better ensure the uniform treatment of creditors where the Chapter 11 reorganization at issue involved an extraordinarily large number of claimants, many asserting claims of indemnity and contribution that might or might not be subject to the stay. None of those concerns arise in the present action. Indeed, the Court of Appeals noted in *Baldwin* that "[t]he possibility of conflicting decisions is far more serious in this complex Chapter 11 proceeding with its numerous indemnity claimants than would be the case when a District Court determines that a particular governmental enforcement action is within one of the exceptions to the automatic stay." *Baldwin,* 765 F.2d at 349.

section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; . . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . .

11 U.S.C. § 362(a). "The general policy behind this section is to grant complete, immediate, albeit temporary relief to the debtor from creditors, and also to prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected." *Brennan*, 230 F.3d at 70 (internal quotation marks and citation omitted).

■ Several exceptions to the automatic stay are established in § 362(b). One of those exceptions, set forth at subsection (b)(4), is directly applicable to this case because it provides that the filing of a bankruptcy petition does not operate as a stay

under paragraph (1), (2), [or] (3) . . . of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other

than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power.

11 U.S.C. § 362(b)(4). The Court of Appeals has explained that the purpose of this exception is to prevent a debtor from "frustrating necessary governmental functions by seeking refuge in bankruptcy court." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir.1991) (internal quotation marks and citation omitted). And the Supreme Court has stated that "[i]t is clear from the legislative history that one of the purposes of this exception is to protect public health and safety." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494, 503, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).[2] "Thus, 'where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection*, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.' " *Brennan*, 230 F.3d at 71 (quoting H.R.Rep. No. 95–595, at 343 (1977), U.S.Code Cong. & Admin.News, at 6299) (emphasis added). There is an exception to the exception in § 362(b)(4), because the section, by its own terms, limits the exception to the automatic stay to the "enforcement of a judgment other than a money judgment." 11 U.S.C. § 362(b)(4).

It is not disputed that either the State or the DEC is a governmental unit charged with enforcing the state and fed-

**2.** The Court in *Midlantic* was referring to the former 11 U.S.C. § 362(b)(5), which permitted a governmental unit's enforcement of "nonmonetary" judgments. In 1998, § 365(b)(5) was repealed and incorporated into the amended § 362(b)(4). *See* Pub.L. No. 105–277, Div. I, Title VI, § 603(1), Oct. 21, 1998, 112 Stat. 2681–2866 (1998). Section 362(b)(4) now provides both that a governmental unit's enforcement of its police and regulatory powers is excepted from the automatic stay and that any such enforcement may include "the enforcement of a judgment other than a money judgment." 11 U.S.C. § 362(b)(4).

eral environmental laws that form the basis of the Consent Decree in this case. Therefore, the two questions that must be addressed in determining the application of the automatic stay are (1) whether this action is an action or proceeding to enforce the State's police and regulatory power, and, if so, (2) whether a judgment incorporating the Consent Decree qualifies as "a judgment other than a money judgment".

In *City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir.1991), the Court of Appeals for the Second Circuit held that "governmental actions under CERCLA to recover costs expended in response to completed environmental violations are not stayed by the violator's filing for bankruptcy." *Id.* at 1024. The court noted that in determining whether a particular action falls within the exception in § 362(b)(4), the focus is properly on "what entity is bringing it, and for what purpose." *Id.* at 1025. The court observed that § 362(b)(4) requires that suits falling within the exception must be brought by governmental units, but that the section "does not mandate what form, under what statute, or in what capacity the governmental unit must sue." *Id.* The action must merely be one brought "to enforce" the governmental unit's police or regulatory powers-that is, an action "to deter the would-be violator." *Id.* The court concluded that New York City's reimbursement action under CERCLA was within the exception of § 362(b)(4), because the suit was "a direct exercise of a government's police power to protect the health and safety of its citizens," and because it would "provide an effective deterrent to violators, who will be forced to pay for the government's costs in responding to their violations." *Id.* at 1024. The action taken by the State in this case will also deter would-be violators, because it requires Mirant to come into compliance with state and federal environmental laws by implementing pollution controls at the Lovett Plant or by shutting down the Units at issue altogether. The action here also serves to protect the health and safety of the State's citizens by reducing the emissions of nitrogen oxides and sulfur dioxide. Moreover, in contrast to *Exxon Corp.*, this action does not seek any reimbursement costs from the debtor.

The issues presented by this motion are similar to those addressed by the Court of Appeals for the Third Circuit in *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267 (3d Cir.1984). In *Penn Terra*, the Commonwealth of Pennsylvania's Department of Environmental Resources ("DER") had entered into a consent decree with Penn Terra, an operator of coal surface mines, that was designed to bring Penn Terra into compliance with state environmental laws and to rectify prior violations of those laws. Penn Terra did not comply with the consent decree's schedule of corrective measures, and it eventually filed a Chapter 7 bankruptcy petition. DER brought an equitable action seeking an injunction that would correct Penn Terra's violations of state environmental laws as well as enforce the terms of the consent decree. Penn Terra claimed that the state's action was stayed by § 362(a) as a result of its pending bankruptcy proceedings.

The Court of Appeals concluded that the actions taken by DER fell "squarely within Pennsylvania's police and regulatory powers." *Id.* at 274. DER was seeking "to force Penn Terra to rectify harmful environmental hazards," and the court observed that "[n]o more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined." *Id.* So too here. Through this Consent Decree, the State seeks to reduce the Lovett Plant's emissions of nitrogen oxides and sulfur dioxide, both of which are pollutants regulated by the Clean Air

Act. The Consent Decree also seeks to ensure ongoing compliance respecting these pollutants by requiring Mirant to implement Best Available Control Technology (BACT), as required by the PSD provisions of the Clean Air Act. The State's actions in this case are plainly directed at protecting the environment and natural resources of New York by rectifying and preventing the ongoing pollution at the Lovett Plant.

The Court of Appeals in *Penn Terra* also concluded that the state's action was not the enforcement of a money judgment. As an initial matter, the court observed that "as a matter of form" it was clear that the proceeding initiated by DER was not to enforce a money judgment, because the proceeding was "an action in equity to compel the performance of certain remedial acts by Penn Terra." *Id.* at 275. The court also noted that even the entry of a money judgment by a governmental unit in regulatory proceedings is not affected by the automatic stay, only the enforcement of a money judgment. *Id.* Neither the proceeding nor the injunction would result in "the payment of compensation to the Commonwealth's coffers." *Id.* Nonetheless, Penn Terra contended that the action "in substance" was one to enforce a money judgment, because compliance with the injunction sought by DER would require Penn Terra to spend money. The court rejected this argument, stating: "Were we to find that any order which requires the expenditure of money is a 'money judgment,' then the exception to section 362 for government police action, which should be construed broadly, would instead be narrowed into virtual nonexistence." *Id.* at 277–78. Instead, the court concluded that the inquiry into whether an equitable remedy is in substance a money judgment is "more properly focused on the nature of the injuries which the challenged remedy is intended to redress-including whether

plaintiff seeks compensation for past damages or prevention of future harm...." *Id.* at 278. The court concluded that the injunction sought was, neither in form nor substance, the type of remedy traditionally associated with a "money judgment":

It was not intended to provide compensation for past injuries. It was not reduceable to a sum certain. No monies were sought by the Commonwealth as a creditor or obligee. The Commonwealth was not seeking a traditional form of damages in tort or contract, and the mere payment of money, without more, even if it could be estimated, could not satisfy the Commonwealth Court's direction to complete the backfilling, to update the erosion plans, to seal mine openings, to spread topsoil, and to implement plans for erosion and sedimentation control. Rather, the Commonwealth Court's injunction was meant to prevent future harm to, and to restore, the environment.

*Penn Terra,* at 278. The same analysis applies to the action taken by the State of New York in this case.

Mirant contends that compliance with the terms of the Consent Decree will require outlays in excess of $100 million, but that fact does not make the State's action in seeking entry of a judgment pursuant to the Consent Decree one for the enforcement of a money judgment. Any money expended by Mirant will go toward complying with state and federal law, and will not be deposited in the State treasury. Indeed, the State has explicitly agreed to forego its right, under the applicable laws, to seek civil penalties from Mirant for past violations, even as it is seeking those penalties from Orange & Rockland Utilities. The State merely seeks to require that Mirant come into compliance with the law and prevent any ongoing pollution. Under the Consent Decree, Mirant can elect from

several options the most economical route to compliance with the law, from implementing control technology to shutting down altogether the polluting units of the Lovett Plant.

■ In opposing the motion to enter the Consent Decree, Mirant argues that the decree is a post-petition agreement by the debtor that must be approved by the bankruptcy court. Mirant contends that the decree is post-petition because, although the parties signed the decree before Mirant filed for bankruptcy, the decree has not yet been approved by this Court. Mirant cites no authority in support of this proposition, but it contends that the Consent Decree must be approved by the bankruptcy court because it could be construed as an action by the debtor "other than in the ordinary course of business" that affects the property of the bankruptcy estate. 11 U.S.C. § 363(b)(1). This argument is unpersuasive because Mirant is not being required to take any action at all with respect to entering the Consent Decree. Mirant signed the Consent Decree on June 11, 2003, more than one month before it filed its bankruptcy petition, and the Court could have entered the Consent Decree at any time thereafter without any further action by Mirant. *Cf. S.E.C. v. Levine*, 881 F.2d 1165, 1178–79 (2d Cir. 1989) ("A consent judgment, though it is a judicial decree, is principally an agreement between the parties.... Thus, consent judgments should be interpreted in a way that gives effect to what the parties have agreed to....."). Entry of the decree by this Court requires no action by Mirant, and thus no action that might be outside the ordinary course of business. Entry of the Consent Decree will not alter in any way the agreement the parties reached on June 11, 2003, before Mirant filed its Chapter 11 bankruptcy petition.

■ Mirant also argues that even if the Consent Decree is a pre-petition agreement, the decree is an executory contract and therefore must be approved by the bankruptcy court before Mirant can be fully bound by its terms. Mirant points to § 365(a) of the Bankruptcy Code which permits a Chapter 11 debtor-in-possession to assume or reject any executory contract of the debtor, subject to approval by the bankruptcy court. *See* 11 U.S.C. § 365(a). This argument is also unpersuasive. Section 365(a) is not a directive to this Court requiring it either to await or to defer to the bankruptcy court's approval of the Consent Decree. Approval by the bankruptcy court is not a prerequisite to this Court's approval of a Consent Decree that has already been signed by the parties, is fair, reasonable and in the public interest, and meets all the requirements for entry. Mirant has pointed to no authority that suggests otherwise.

Moreover, Mirant ignores the full implications raised by its argument that § 365 applies to the Consent Decree and requires Mirant to get approval from the bankruptcy court. In particular, it fails to account for the prospect that the bankruptcy court might require it to reject the Consent Decree. In that event, the rejection would be treated as a breach of contract, and the State would be left with a claim against the estate. *See* 11 U.S.C. § 365(g)(1). Not only would such a result be an end run around the exception to the automatic stay in § 362(b)(4), it would also conflict with the decision by the Court of Appeals in *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir.1991), that the State's order to a debtor to end or ameliorate pollution does not constitute a "claim" that is dischargeable in bankruptcy. *See id.* at 1008; *see also In re Torwico Electronics, Inc.*, 8 F.3d 146, 151 (3d Cir.1993) (relying on *Chateaugay* to conclude that New Jersey's order to debtor to clean up waste site

that caused ongoing pollution problems was not a "claim" within the meaning of 11 U.S.C. § 101(5), and thus was "an exercise of the state's inherent regulatory and police powers").

Therefore, the action is not stayed, nor is entry of the Consent Decree subject to the automatic stay provision in 11 U.S.C. § 362(a). Furthermore, there is no basis to conclude that the bankruptcy court's approval of the Consent Decree is required before this Court exercises its jurisdiction to enter the Consent Decree.

### B.

■ Because the proposed Consent Decree comes within the Court's subject matter jurisdiction, and because its entry would not be stayed by the bankruptcy proceeding, the Court must next determine whether the decree comes within the scope of the parties' dispute as determined by the pleadings and whether it furthers the objectives of the law upon which the complaint was based. *See Kozlowski,* 871 F.2d at 244; *Cronin,* 898 F.Supp. at 1064.

The proposed Consent Decree unquestionably falls within the scope of the case as set forth in the complaint. The complaint alleges that Mirant's predecessor modified Units 4 and 5 of the Lovett Plant without complying with the applicable PSD requirements of the Clean Air Act. The complaint further alleges that Mirant has continued to operate these Units in violation of the PSD requirements and without implementing BACT to reduce the emissions of nitrogen oxides and sulfur dioxide. The proposed Consent Decree resolves this dispute between the parties by requiring Mirant to implement controls, or take other measures (including shutdown), to reduce the emissions of nitrogen oxides and sulfur dioxide from Units 4 and 5.

The proposed Consent Decree also promotes the objectives of federal and state environmental laws. The controls implemented pursuant to the Consent Decree would significantly reduce the emissions of nitrogen oxides and sulfur dioxide from the Lovett Plant, furthering Congress's intent in the Clean Air Act to improve air quality and protect the environment.

In opposing the motion to enter the Consent Decree, Mirant has not contested either that the decree falls within the scope of the dispute set forth in the complaint or that the decree would further the objectives of state and federal environmental laws.

### CONCLUSION

For the reasons explained above, the Consent Decree is approved without modification and will be entered forthwith.

**SO ORDERED.**